THE NEW MILFORD SECURITY COMPANY, ADMINISTRATOR, *vs.* THE WINDHAM COUNTY NATIONAL BANK.

First Judicial District, Hartford, January Term, 1916.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

It has long been the general policy of our law that the universal administration of an insolvent estate for the benefit of creditors should work a dissolution of freshly-made attachments of the debtor's property; and in the application of this legal principle no sound distinction can be drawn between living and dead insolvents. Accordingly, to effectuate this policy, the provision in General Statutes, § 279, declaring that "the commencement of proceedings in insolvency shall dissolve all attachments . . . made within sixty days next preceding," must be construed as applicable to the estate of a decedent debtor which is being settled in the Court of Probate as an insolvent estate, as well as to the property of insolvent debtors who are alive, notwithstanding that the statute in its original form and prior to 1875 might have been treated as having referred only to estates of living persons.
The case of *Craig* v. *Wagner*, 88 Conn. 100, explained and distinguished.
In enacting the Survival Act of 1903, whereby existing attachments were not dissolved *ipso facto* by the death of a defendant, the

General Assembly intended not to perpetuate all such attachments without exception, but to perpetuate them subject to their dissolution as provided in § 279.

Argued January 12th—decided April 19th, 1916.

SUIT to set aside an attachment of real estate and of personal property upon the alleged ground that such attachment was originally void, and, if not, that it had been dissolved by proceedings in insolvency commenced within sixty days from the date of the attachment, brought to and reserved by the Superior Court in Litchfield County, *Gager, J.*, upon a demurrer to the complaint and the stipulation of the parties, for the advice of this court.

The case stands upon complaint and demurrer thereto, accompanied by a stipulation that final judgment may be entered in conformity with the advice of this court upon the questions of law arising on the pleadings and formulated in the stipulation for reservation.

The plaintiff is the administrator *c. t. a.* on the estate of Seymour S. Green, who was sued by the defendant bank in his lifetime as indorser upon a promissory note. The action was brought against both maker and indorser on May 25th, 1915, and on that day the officer serving the writ attached certain shares of bank stock and certain described real estate as the property of Green. On the 29th day of May Green died. Plaintiff was appointed administrator *c. t. a.* on June 19th, 1915. On the same day it represented the estate insolvent, and on June 29th commissioners were appointed thereon. The estate was and at all times has been deeply insolvent. After the death of Green and the plaintiff's appointment as administrator, the defendant brought a *scire facias* against the plaintiff as administrator and obtained a judgment, upon which it now

threatens and intends to take out execution and to levy upon the real and personal property attached; and this action is brought to restrain the defendant from levying execution thereon. The plaintiff claims

(a) that under § 279 of the General Statutes the attachments were dissolved by the commencement, within sixty days thereafter, of proceedings to settle Green's estate as an insolvent estate; and

(b) that the attachments of real estate are invalid because of the omission of the attaching officer to make a proper indorsement of his doings on the defendant's copy of the process left by the officer in the office of the town clerk of New Milford, as required by § 829 of the General Statutes. The several grounds of demurrer to the complaint, and all the questions of law upon which our advice is asked, relate to either one or the other of the above propositions.

Section 279 of the General Statutes provides that "the commencement of proceedings in insolvency shall dissolve all attachments and all levies of execution not completed, made within sixty days next preceding, on property of the insolvent debtor; but if the property is subsequently taken from the trustee, so that it cannot be used for the benefit of the creditors of the estate, or if the trust shall be terminated by order of the court, said attachments and levies of execution shall revive," etc.

*Frank W. Marsh* and *Frederick H. Wiggin*, for the plaintiff.

*Ralph O. Wells*, for the defendant.

BEACH, J. It has long been the general policy of our law that the universal administration of an insolvent estate for the benefit of creditors should work a dissolu-

tion of freshly-made attachments. This policy has been manifested, in the case of insolvency proceedings and of receiverships of corporations and partnerships, by statute; and in the case of the settlement of insolvent estates of deceased persons, by the unwritten law up to 1903. In the latter case the attachment was dissolved by the death of the defendant debtor, regardless of its date. Such was the combined effect of the common-law rule that all civil actions should abate on the death of a sole defendant, whether solvent or insolvent, and of the limitations of our survival statutes which provided for the survival of such actions only as might originally have been prosecuted against the executor or administrator; and, with minor exceptions, no actions at all could be originally prosecuted against the executor or administrator of an insolvent estate. General Statutes, § 343. In 1903 a more liberal survival statute was enacted, by which all actions not expressly excepted from the operation of the Act might be continued by or against the executor or administrator of a deceased plaintiff or defendant. Public Acts of 1903, Chap. 193, p. 149. In *Craig* v. *Wagner*, 88 Conn. 100, 89 Atl. 916, we held that the effect of this statute was to continue the original action in force, and thus to preserve the liens of attachments made in the defendant's lifetime.

From this outline it will appear that until 1903 the question whether the phrase "insolvency proceedings" in § 279 is broad enough to include the settlement in insolvency of the estate of a deceased defendant, could not have been raised, because until then the attachment was automatically dissolved by the death of the defendant. It now comes before us for the first time, because in *Craig* v. *Wagner*, 88 Conn. 100, 89 Atl. 916, the estate was not represented insolvent until more than eleven months after the attachment.

As originally passed in 1853, § 279 provided that "whenever an assignment shall be made for the benefit of creditors, or whenever a trustee shall be appointed . . . for the settlement of the estate of an insolvent debtor, all attachments of the property of such debtor, either real or personal, made at any time within sixty days preceding such appointment, or the application to the court of probate for such appointment, shall be dissolved," etc. In this form the statute was expressly confined to proceedings instituted in the lifetime of an insolvent debtor. But in the Revision of 1875 the statute appears in its present form, providing that the "commencement of proceedings in insolvency shall dissolve all attachments . . . made within sixty days next preceding." The special provisions of the original Act were thus changed, in point of form, into a general rule applicable to all proceedings in insolvency, and for forty years the statute has remained in this form.

The settlement of the estate of a deceased debtor as an insolvent estate is, in principle and in practice, a "proceeding in insolvency." By § 8 of the present Federal Bankruptcy Act, Congress has assumed the right, under the power to establish uniform laws on the subject of bankruptcy, to administer the estate of a bankrupt who dies after the commencement of the bankruptcy proceedings. So in our own statutes, the term "insolvent estates" is used to include estates of living and deceased insolvents, and in chapter 28 of the General Statutes we find, under the title "claims against insolvent estates," a series of provisions covering the appointment of commissioners to receive and decide upon the claims of creditors, the limitation of time for exhibiting claims, the character of claims which are allowable, the consequence of failure to seasonably exhibit claims, the commissioners' report

of claims presented, allowed and disallowed, and the proceedings to be taken when a creditor has security for his claim. In all these provisions the term "insolvent estate" is used to include estates of deceased, as well as of living, debtors, and the result is that substantially the entire statutory proceedings relating to the distribution of insolvent estates among creditors apply indiscriminately to both classes of estates. Upon general principles it is therefore impossible to say that the words "proceedings in insolvency," in § 279, which also relates to the rights of creditors, may not include all proceedings taken under these sections of the statutes. Unless expressly limited in some way, these words cannot, for example, include the appointment of commissioners under § 331 on the estate of a living insolvent debtor, and at the same time exclude the appointment of commissioners under the same section on the estate of a deceased insolvent debtor.

There is no such express limitation to estates of living insolvent debtors in § 279. The special provisions for the revival of an attachment, in case the property subsequently escapes from the custody of the law, relate on their face exclusively to insolvency proceedings upon the estates of living debtors. But that does not necessarily signify an intent to limit the Act, because estates of deceased persons cannot escape from the custody of the law until settled either as solvent or insolvent estates. Hence there is no necessity for specially providing for the revival of an attachment in case the estate turns out to be solvent. "If the estate is not insolvent, the lien by attachment is unnecessary, because ample security is provided by the bonds of the administrator." *Green* v. *Barker,* 14 Conn. 431, 435. In short, § 279 is not only applicable in terms and in principle to insolvent estates of

deceased persons, but it covers that ground as adequately as it covers insolvent estates of living debtors.

The real question, therefore, which we have to answer, is whether the General Assembly, in declaring, by the Survival Act of 1903, that existing attachments should not thereafter be *ipso facto* dissolved by the death of a defendant, intended to perpetuate all such attachments without exception, or to perpetuate them subject to the exception stated in § 279. The latter hypothesis seems to us more probable than the former. The reason for dissolving attachments made within sixty days of the commencement of insolvency proceedings applies with equal force to all insolvent estates which are in process of universal administration for the benefit of creditors, whether of living or deceased individuals, or of corporations and of partnerships. If any distinction were to be drawn, special reasons might be found for dissolving such attachments in the case of insolvent estates of deceased debtors. At any rate, the general policy of our law on this subject has been fixed for many years, and it is extremely improbable that the General Assembly should have intended to make an exception to it. On the other hand, § 279 states the existing policy of the law in terms broad enough to include the settlement of insolvent estates of deceased debtors; and even if it were so that the General Assembly had at one time intended § 279 to apply only to insolvency proceedings on the estates of living debtors, we should not now be justified in creating a *casus omissus* by construing the section with reference to that former intent, after the reason for its existence has completely disappeared, and in spite of the broad statement, in § 279, of the underlying principle involved. It is more reasonable to suppose that when the General Assembly passed the Survival Act of 1903 it recognized the controlling fact that the general terms "insolvency proceedings"

and "all attachments," in § 279, were comprehensive enough to express and preserve the existing policy of our law. This conclusion disposes of the whole case.

The Superior Court is advised that both of the attachments in question were dissolved by the commencement, within sixty days, of proceedings to settle Green's estate as an insolvent estate.

In this opinion PRENTICE, C. J., THAYER and RORABACK, Js., concurred.

WHEELER, J. (dissenting). I especially regret my inability to concur in the opinion of the court, since its conclusions avoid in large measure the results flowing from our construction of the survival statute made in *Craig* v. *Wagner* 88 Conn. 100, 89 Atl. 916. I can see no permissible way of avoiding the results of that construction, save by overruling that case, or by remedial legislation.

The principal questions of law presented upon the reservation and pressed in argument are: 1. Whether or not the attachment was dissolved by the death of Green. 2. Whether or not the attachment upon both real estate and stock was dissolved by the insolvency proceedings had on Green's estate. 3. Whether or not the attachment upon the real estate was invalid because the officer had failed to comply with the statute and make "an indorsement of his doings thereon" upon the copy left with the town clerk.

In conformity with our decisions, we held in *Craig* v. *Wagner*, 88 Conn. 100, 105, 106, 89 Atl. 916, that "under the former survival statute, the attachment was immediately dissolved by the death of a sole defendant regardless of the solvency or insolvency of his estate." But we further held, that "since the present survival statute gives to a plaintiff the right, unqualified

by any limitations so far as it exists at all, to continue his pending action against the executor of a deceased defendant, we see no reason why the lien of the attachment should not also be continued, in accordance with the apparent intention of the legislature."

That decision is conclusive that Green's death did not dissolve the attachment. We thus held that the survival statute had changed the pre-existing law, and, as the reporter's head-note phrased it, "introduced a new policy respecting the survival of actions." We also held (p. 107) that "the continuance of the attachment is also in harmony with the liberal provisions of the Practice Act."

*Craig* v. *Wagner*, 88 Conn. 100, 89 Atl. 916, is decisive that the attachment upon Green's real estate and stock continued after his death, unless it was dissolved by virtue of General Statutes, § 279, through the insolvency proceedings had on Green's estate within sixty days after attachment. The court's conclusion that the attachment was so dissolved, is dependent wholly upon its holding that the commencement of insolvency proceedings on Green's estate within sixty days next following the attachment did dissolve it, and, as a consequence, placed this limitation upon the construction of the survival statute made in *Craig* v. *Wagner*. Reading § 279 in the light of its history and of the purposes and scope of the Act of which it is a part, this construction seems to me not even a possible one, much less a reasonable one.

As originally enacted (Public Acts of 1853, p. 102, Chap. 60, § 3) § 279, as the opinion states, "was expressly confined to proceedings instituted in the lifetime of an insolvent debtor." We find the wording of this section substantially in the Revision of 1866, so that it is admitted that, up to the Revision of 1875, this section applied to a living insolvent debtor and not to the es-

tate of a deceased debtor. The opinion further holds that, in the Revision of 1875, the form of the original Act was changed "into a general rule applicable to all proceedings in insolvency." If the revisers did this they, concededly, made a substantial change in the structure of our statute law. They manifestly acted in violation of their legislative instructions to "as far as practicable, consolidate all Acts relating to the same subject-matter, correct ambiguities, supply all manifest omissions," etc. Revision of 1875, Preface, p. XI. "The end in view," in each of our several Revisions, "was to secure such a codification and correction of the existing law as would make it clear, certain, and reasonably uniform in operation." *Hartford & C. W. R. Co. v. Montague,* 72 Conn. 687, 691, 45 Atl. 961.

JUDGE BALDWIN was as responsible for the Revision of 1875 as any member of the commission of revision. In *Duffield v. Pike,* 71 Conn. 521, 529, 42 Atl. 641, he said: "In preparing that [the Revision] of 1875 it was thought necessary to pursue a rigid policy of abbreviation and condensation, in order to keep our general laws within the compass of a volume of moderate size. . . . Revisors are presumed not to change the law, if the language which they use fairly admits of a construction which makes it consistent with the former statute." We shall not be apt to go far amiss if we assume that JUDGE BALDWIN speaks with authority and exactness concerning the purposes, motives, and work of the revisers of 1875. Similar language was used by JUDGE PRENTICE in *Stapleberg v. Stapleberg,* 77 Conn. 31, 35, 58 Atl. 233, in reference to the Revision of 1888, and by CHIEF JUSTICE TORRANCE in *Campbell's Appeal,* 76 Conn. 284, 288, 56 Atl. 554, in reference to the Revision of 1902.

The duty of revisers has been similarly frequently pointed out by us, and we have uniformly held to the

presumption that our revisers have acted within their duty and according to their instructions. *Hoyt* v. *Guarnieri,* 67 Conn. 590, 35 Atl. 511; *State* v. *Ryan,* 80 Conn. 582, 69 Atl. 536; *Bartram* v. *Hopkins,* 71 Conn. 505, 517, 42 Atl. 645; *Ross* v. *Crofutt,* 84 Conn. 370, 376, 80 Atl. 90.

Let us examine the provisions of the Revision of 1875, relating to this matter, to ascertain whether its revisers committed so plain a breach of duty as to require us to hold that the phraseology of § 279 breaks down the presumption surrounding their work and makes reasonable no construction other than that they, in fact, changed the long-existing law. Chapter XI of Title 18, Revision of 1875, is entitled "Estates of Deceased, and Insolvent Persons." It is divided into three parts, viz., Part I, of Deceased Persons; Part II, of Insolvent Persons; Part III, General Provisions. Parts I and II are entirely independent of each other, separate chapters of the same title. All of Part II relates to the voluntary and involuntary insolvency provided for by the chapter. Among the thirty-eight sections of Part II the twenty-fifth is the section in question. Together they "comprise in the fullest sense our insolvent law." Not by its terms nor by those of any other section of Part II is the twenty-fifth section made applicable to those provisions of Parts I and III relating to the settlement of the estate of a deceased person as an insolvent estate. How, then, can it be said that revisers intended this section to relate to Parts I and III? The index separates the subjects of Part I and II. The arrangement of these subjects in the Revision clearly shows that the revisers did not intend to make this section applicable alike to insolvent debtors and to the estates of deceased persons. Part II provides two methods of settling the estate of an insolvent debtor, the one by proceedings in voluntary insolvency, the

other by proceedings in involuntary insolvency, and both methods apply to the estates of the living and not the dead. Section 25 reads: "The commencement of proceedings in insolvency shall dissolve all attachments and all levies of executions not completed, made within sixty days next preceding, on the property of the insolvent debtor." This language was used in place of § 3 of chapter 60 of the Public Acts of 1853, which reads: "Whenever an assignment shall be made for the benefit of creditors, or whenever a trustee shall be appointed under the provisions of this Act, for the settlement of the estate of an insolvent debtor, all attachments of the property of such debtor, either real or personal, made at any time within sixty days preceding such assignment, or the application to the court of probate for such appointment, shall be dissolved," etc.

The making of the assignment and the appointment of the trustee were the initial steps in the proceedings in insolvency provided for in the Act of 1853, and it seems too obvious for comment that the purpose of the revisers, in the use of the words "the commencement of proceedings in insolvency," was to express in shorter form the acts which were referred to in the original statute as the commencement of the proceedings in insolvency. By the express terms of the statute the attachments which are dissolved are those only made "on the property of the insolvent debtor." This is the language of the original Act, and both there and here it refers to an attachment upon the property of the living insolvent debtor, not upon the property of a deceased insolvent debtor. Section 25 continues: "but if the property is subsequently taken from the trustee, so that it cannot be used for the benefit of the creditors of the estate, said attachments and levies of execution shall revive, and the time from the commence-

ment of proceedings in insolvency to the time when the trustee shall be dispossessed of the property, shall be excluded from the computation in determining the continuance of the lien created by such attachment." This is a part of a single sentence which comprises a single section of this Part. The property and the attachment that it is still referring to are those referred to in the first part of the sentence. These revival provisions, the court concedes, "relate on their face exclusively to insolvency proceedings upon the estates of living debtors." How is it possible for the second third of this sentence to refer to living debtors and the first third to deceased debtors, when the same attachment and the same property attached are referred to in both parts? The third part of this sentence provides for the allowance to the attaching creditor of his legal costs "accruing before the time of the appointment of a trustee," so that every part of this section has reference solely to the attachment of the property of living debtors. If the proceedings in insolvency, referred to in the first third of this section, include the settlement of the estate of a deceased as an insolvent estate, and also the revival and cost procedure, referred to in the last two thirds of the section, why were not the revival and cost features of this section made applicable to the attachment of the property of deceased persons whose estate is in process of settlement as an insolvent estate? The same reasons exist for the one as the other.

The wording of this section in the Revision of 1875 has continued to the present time, and § 279 of the General Statutes of 1902 is § 25 of chapter 11 of Title 18 of the Revision of 1875. It is very clear there has been no change in the purpose or meaning of this statute from its origin to the present. It applies to the living, to the estates of the living in process of settlement under this Act, now chapter 23 of the General Statutes

of 1902 relating to insolvent debtors. The insolvency proceeding of § 279, and the settlement of the estates of deceased persons represented as insolvent, have always been separated by chapter and title in every Revision, both after as well as before that of 1875. There is nothing in this section or in its history or that of the Act of which it is a part, which has been pointed out or which I can perceive which discloses an intention to extend the meaning of § 279 as it first appeared in the Revision of 1875, so as to include within its terms the insolvent estate of the dead.

In the Revision of 1902, chapter 23 of Title 4 relates to the estates of insolvent debtors, while chapter 29 of Title 4 relates exclusively to the estates of deceased persons settled as insolvent estates; and chapter 28 of the same title relates to the procedure for proving claims against the estates of deceased persons and against the estates of deceased represented as insolvent. Wherever this procedure can be assimilated this course is adopted, but it is noticeable that in the character of the claims allowed and in the time limited for the presentation of claims a difference is noted between these two classes. The estate of the insolvent debtor, and the estates of deceased persons represented as insolvent, are treated separately as they always have been. Section 279 is today, as it was in 1853, a part of an Act providing an insolvency proceeding for the relief of insolvent debtors. We have said our insolvent law was superseded by the Federal Bankruptcy Act. *Rockville National Bank* v. *Latham*, 88 Conn. 70, 71, 89 Atl. 1117. We did not limit our statement to the provisions of our insolvent law relating to the estates of living debtors. We should have done this had our proceedings in insolvency included the settlement of the estates of deceased persons represented as insolvent. For the Bankruptcy Act of 1898, like

all of our other Bankruptcy Acts, contains no provision for administering the estates of deceased insolvents or those represented to be insolvent. So that in the case of the estate of a deceased person represented as insolvent, the Federal Act could give no jurisdiction. Collier on Bankruptcy (1914 Ed.) p. 127. If death occurs after the adjudication in bankruptcy the estate continues in bankruptcy. Bankruptcy Act of 1898, § 8 (30 U. S. Stat. at Large, p. 549). But in this instance the settlement of the estate of this deceased as an insolvent estate succeeded his decease. It would seem that the analogy found by the court to the Federal Act must fall.

At no time since the Revision of 1875 went into effect have the proceedings in insolvency of § 279 been esteemed to include the settlement of the estates of deceased persons represented as insolvent. We had occasion to construe § 279 in *Coit* v. *Sistare*, 85 Conn. 573, 577, 84 Atl. 119, and we there said: "Our statutes have never specifically given the attaching creditor a lien upon the attached property by virtue of the attachment. They have, however, treated the attachment as a lien, in cases of the defendant's insolvency, by providing that insolvency proceedings shall dissolve all attachments made within sixty days before the insolvency proceedings were commenced, and providing that the lien created by the attachment shall revive, if the attached property shall be taken from the trustee in insolvency, or the trust terminated by order of the court. General Statutes, § 279. A similar provision is made in the case of receiverships. General Statutes, § 1053." This language refers to the attachment of the property of living debtors. We did not then think § 279 applied to the settlement of the insolvent estate of the deceased. A reading of *Craig* v. *Wagner*, 88 Conn. 100, 89 Atl. 916, on page 106,

shows that we did not at that time entertain the present view of the court as to § 279. The insolvency proceeding referred to in § 279 rests upon the fact of insolvency, admitted or proved. General Statutes, 1902, § 341, provides: "The estate of any deceased person may be settled as an insolvent estate, if the court of probate deem it expedient." This form of the statute first appeared in the Revision of 1875, and it has remained in this form ever since.

Originally the settlement of the estate of a deceased person as an insolvent estate might have been had when it appeared to the executor or administrator that the estate would probably be insufficient to pay the debts of the deceased. It thus appears that the fact of insolvency was never a condition precedent to the settlement of an estate as an insolvent estate. Under § 341, whether the estate shall be so settled depends upon whether the Court of Probate shall determine that it will be the best method of settling the estate of the decedent. An optional provision of this kind bears no relation to the Federal provisions providing for a voluntary or an involuntary bankruptcy or to the voluntary or involuntary insolvency of insolvent debtors provided for by the Revision of 1902, chapter 23.

There is left to consider whether the attachment upon the real estate is invalid through the failure of the officer to comply with the statute. Prior to 1855, the officer attaching real estate was only required to leave with the person whose estate was attached, or at his usual place of abode, a true and attested copy of the writ, and of his return describing the estate by him attached. Chapter 95 of the Public Acts of 1855 (p. 117) imposed the further requirement that the officer file a certificate of attachment signed by him with the town clerk containing: a statement that the officer

had made such attachment, describing the land attached, the parties to the suit, the court to which the process was returnable, and the damages claimed; and further, that the officer leave, four days after the attachment, a full and certified copy of process under which the attachment was made, with an indorsement of his doings thereon. Chapter 63 of the Public Acts of 1861 (p. 67) provided that no attachment, unless made in the manner prescribed by the Act of 1855, should be valid. These statutes were consolidated and re-enacted in a single section in the Revision of 1875 (§ 4, Chapter 2, Title 19, p. 402).

Aside from minor changes of language of no significance in meaning, and of the addition by an amendment in 1903 of one more requirement to those to be specified in the certificate of attachment, § 829 of the General Statutes of 1902 is identical with the original Act of 1855, except that: The Act of 1861 specified that no attachment not made in the manner prescribed by the Act of 1855 should be valid. While, in place of this, the Revision of 1875 substituted, "and unless the service shall be so completed, such estate shall not be holden against any other creditor or *bona fide* purchaser." In effect, the only difference between the 1861 provision and that of 1875 is that the former made all attachments not so made, even as against the owner, invalid, while the latter made attachments not so made invalid against creditors and bona fide purchasers only. The language "any creditor" does not mean any attaching or lienor creditor. The context and history of the Act do not admit of a limitation of this language from its natural meaning. The requirement that the officer, as a part of the service, should leave with the town clerk a full and certified copy of the process, with an indorsement of his doings, was one of the statutory conditions of service. He could not fulfil this condition

by leaving a copy of process, as he did, without his indorsement, any more than by leaving his indorsement without the copy. This requirement was made a statutory condition precedent to the validity of the attachment as against creditors, and hence against this plaintiff, who stands as the representative of creditors. It was as much a condition precedent as the filing of the certificate of attachment. Neither could be dispensed with. It is beside the point whether this requirement served a wise purpose. We must presume that it did, otherwise the General Assembly would not have made it a part of the process of attachment.

The doings of the officer not indorsed upon this copy of the process were: 1. The fact that he had left the certificate of attachment with the town clerk. 2. The fact that he had made attachment of the bank shares. 3. The fact that he had made service on the New England Hat Company, the other defendant. 4. The fact that he had made service upon Green, the indorser of the note and owner of the land attached.

The purpose of the certificate of attachment was to provide a speedy method for holding the property. The purpose of leaving a copy of the process, with the officer's indorsement of his doings thereon, was to furnish all the world with notice that the attachment and service had been completed. Without this copy the searcher of the title could not know but that the certificate of attachment was nugatory; from the copy of process duly filed and indorsed he would know that service had been completed and look to the court records to ascertain the further disposition of the case. Far from being unessential and a mere matter of convenience, as the plaintiff argues, I think it was of the essence of the completed attachment and service and a mandatory provision of the statute. The cred-

itors whose claims accrued between the time of the attachment and the death of Green may have had the special interest which an inspection of the land records would have given them in telling them of the defect in the copy of process filed with the town clerk. But the statute was not intended for their especial protection, but for that of all creditors.

The demurrer runs against the entire complaint. The complaint covers two subjects of attachment. The proper method of reaching by demurrer each cause of action stated in a single count is indicated in Practice Book, §§ 170 (a) and 198 (pp. 252, 258). The first five grounds of demurrer do not relate to both subjects of attachment and are not so framed as to be capable of eliminating either from the complaint. The sixth ground of demurrer—the claim of the dissolution of the attachment by the settlement of the estate as an insolvent one—is the one ground which apparently covers both of the subjects of the attachment, and is bad against both. The seventh may relate to both subjects of attachment, but is dependent upon a decision of the sixth ground in favor of the defendant.

The court, in my opinion, should be advised that: Question 3a should be answered in the affirmative. Question 3b should be answered in the negative. Question 3c, so far as relates to the stock, should be answered in the negative. Question 3c, so far as relates to the real estate, should be answered in the affirmative, viz., that the defendant ought to be enjoined from taking out execution upon the judgment in the original suit.

The demurrer, in my opinion, should be overruled.